We will hear argument next in number 18-1730, In Re Baronov. Mr. Cahill. May it please the court. My name is Ron Cahill and I represent the appellants and patent applicants in this case. Dr. Demeter Baronov et al. Dr. Baronov's invention is not directed to an abstract idea under Step 1 of ALICE because it provides an improvement to the operation of a medical device. And if we reach Step 2, Dr. Baronov's invention is patentable because it's a medical device, is that? It's the software that's coupled to physiological sensors that measure certain data about the patient and then goes through an estimation routine to tell us things about the patient that the sensors could never tell us. In essence, the medical device, and the FDA regulates this as a medical device, can now measure parameters, measure, finger quotes, parameters that it could never measure before. And I'd like to talk about what some of those are. If we reach Step 2, Dr. Baronov's invention is patentable because its recited steps are unconventional and not known in the industry. Now, turning to Claim 1. One way to understand Claim 1 is that it relates to information at three different levels. The most basic level is data, and that data is acquired from physiological sensors. Now, that data is not the internal state variables of the claim. That's the next higher level of information. Rather, it's data associated with those variables. Is that what's covered by the M, the measure? Yes, that's exactly right. So, an example of data that's measured might be the output of a heart rate monitor. It gives you a signal that's representative of heart rate. It's a noisy signal. It's not perfect. It's not exact. But it's data, and the system can use that. Now, the next level up is the internal state variables. Now, the internal state variables are not the same thing as the data. They're not, even if... What are they? They are estimated parameters. And so, even if an internal state variable is heart rate, it may not be the same as what you measure. Because, as your owner noticed, in the math that gets done here, each internal state variable, its estimate is based on all of the measurements and on predictions from all of the other state variables. So, when you see M as a function of T sub K there, the specification explains that that's all of the measurements. It's not just one. And so, the state variables are based on all of the measurements. And the ISV sub S is a particular state variable, right? It's integrated across all of them. No, no, no. Just the sub S before you get to the integral. I'm just looking at the right-hand term under the integral. Yes. So, the sub S is replaced by ISV1, ISV2, ISV3, ISV4. So, it's all of the internal state variables. Right, but each term, each of the sub S's is a particular internal state variable. Yes, that's correct. So, you're saying you're looking at a particular internal state variable like heart health or something. What the probability of that value is given all of the measurements on everything at time T sub K. Correct. Okay. And then you're multiplying by, is it going to stay that way until tomorrow? That's the first term under the integral. Until T sub K plus one. That's what I mean by tomorrow. Exactly. So, yes. And the way that works in the claims is there's first a prediction. We predict what all of the state variables will be tomorrow. And that prediction is based on what you've determined already? That's based on what's come before, yes. And what exactly has come before? What's come before is more data, more measurements, and prior estimations. And what are the prior estimations based on? Well, this is a recursive filter. So, there's an initial estimation, and then at each time step, there's more data and more estimates. So, we predict what the heart rate will be tomorrow. And then tomorrow, we check all the data and compare it to all of our predictions for the state variables. And based on that, there are posterior probability density functions that are built that tell you, that estimate for you, what the internal state variable is now. And where this gets truly important is internal state variables don't have to be the things that you measure. So, in fact, expressly in the claim, they're not. If you look to the specification, one of the key problems that's addressed on the way to developing the diagnoses that come at the end, that come in element four of claim one, is the problem of hidden parameter estimates. So, it turns out that a key parameter for this system is delivered oxygen. And you can see this example in the appendix at pages 59 to 63. It's something that you can't measure. It's something that your heart rate monitor and other physiological sensors can't tell you. But claim one can, because when it's an internal state variable that can be based on the data that you do measure and on other state variables. And so now, your medical device, it can measure, finger quotes again, parameters that it couldn't measure. And that's a key part of what this invention is. It's the problem that the inventors set out to solve when they set out to come up with a system that delivered objective diagnoses. And those are also the steps that the examiner found were not conventional or well-known in the industry. So, this invention has an important technical effect, which we think takes it out of step one. But the very thing that gives it that technical effect, those are steps that are not conventional, right? The examiner said that it was the recited elements that were not conventional or well-known. And so, these unconventional elements get you to this place through the first three elements of claim one. What did the examiner mean in the examiner's answer when the examiner said the only element of the current invention that may be considered a non-routine, unconventional, and not well-understood activity is applicant's specified algorithm? I'm looking at JA 898-89. So, I think what he's talking about there are actually the elements of the claim. And so, it sounds like he's saying everything in the claim except for your recited algorithm is routine, is conventional, and is well-understood activity. I mean, we can quibble over whether he's right or wrong, but that appears to be what he's saying in his examiner's answer. So, what the specifics of what he said on the record, and I'm quoting this out of the solicitor's brief, is receiving data, processing the received data, and calculating using the formula a new set of data, and subsequently identifying particular data are well-understood routine and conventional activities. And we wouldn't disagree that once somebody has conceived and laid out all of these steps, that implementing on a general-purpose computer can be done. A person of ordinary skill in the art can do that. But, in fact, putting these steps together so that your medical device can measure, and I keep using my finger quotes, things that it can't measure, that seems to be neither abstract nor is it conventional or routine. So, can we talk about cases like, in your remaining time, electric power group and SAP, which seem to be about grabbing data, collecting data, maybe from sensors, and then analyzing that data, perhaps running it through some formulas, algorithms, rules, and then outputting some kind of indication of something, perhaps that the health status of an electric power grid or something to do with investments. And so, what's going on here that differentiates what's going on here from those claims, which were at bottom about grabbing data, analyzing data, and then outputting a new type of data based on the analysis of the collected data. Well, in electric power, the claims did, in fact, call for collecting, analyzing, and displaying data in the context of power grid monitoring. Those claim elements, however, were said to be purely conventional, that the things that were measured were known measurements, that the analysis that was done was known analysis, and that the output was exactly the output that you'd expect. In essence, the invention was simply taking what people already did,  and putting it on a computer. SAP had a little twist to it, and that is... Maybe even a big twist, like a really unconventional algorithm. So, in SAP, there was a twist. And in SAP, we have selecting a sample space, generating a distribution function in a certain way, and that's where the twist is, and generating a part of the distribution function. But, again, essentially, these were all well-known steps in the art of financial analysis, and what changed was the particular distribution function, that the inventors had recognized that the Gaussian distribution that had traditionally been used was maybe not accurate, and they came up with a resampled distribution. They essentially swapped out one distribution for another. And that was the... As I understand it, and Geronimo perhaps knows much more about this than I do, that was the twist. You may have studied it more recently. But the court found, and I think this is critical for our purposes here, that there were no factual allegations from which one could plausibly infer that those steps were inventive. That's what the court said. Here, it's different. Right, but, I mean, this part I think I do remember. It wasn't because there were no facts on which one could conclude that it wasn't innovative, brilliant, clever, and useful, but just not on the right side of the line of where that advance has to take place. Well, isn't that a question of whether it's an abstract idea or not, as opposed to step two? Well, another way of putting it is that all of the innovativeness was in the abstract category. And why is this not that? Because this is a concrete series of steps that are sequenced in time, pulling data from physiological sensors connected to a patient to then reach conclusions that have never been reached before. You are into your rebuttal time. Why don't you save that time? You can continue, but I think we're going to stick to the time on this one. I'll save it for rebuttal. Thank you. Good morning, Your Honors. May it please the Court, Coke Stewart Propelli, Director of the USPTO. What I think I heard this morning was a slight shift in argument on behalf of Baranoff. I think what the real focus of the argument was in the brief to this Court was whether the claims describe an improvement to a computer. They didn't really talk a lot about medical devices or other technological improvements, and I think based on the case law that's been decided by this Court, this type of discussion is really not something that's improving the computer. If you look at the specification, and this kind of falls under the government's inquiry as to whether the claims are adding significantly more, the specification talks about the use of conventional hardware, and that's conventional hardware in terms of the sensors, which are described. So medical devices today, many of them, will have extremely sophisticated processing. Let's just call those computers. So the part of the medical device that's being improved is the computer. It's still a medical device, and you're getting health information that you wouldn't get. So why is that not eligible? Well, following the two-step framework, first we look to see whether there's been an abstract idea, and here I think the examiner found and the Board properly affirmed that what's being discussed may be very novel. The algorithm may be novel. It may not have been used before. It may not have been used before in the health care industry, but that's very similar to other cases, including cases before the Supreme Court like Parker v. Fluke. So we can't look to the novelty of the formula to evade the Section 101 inquiry, and when we look to Step 2 and we see, you know, is there something more happening here, or is it just, you know, take this idea and put it on a computer, that's where we have, you know, our conventional medical equipment. We have our conventional computer hardware, which is recited as just processor memory, network interface, et cetera, and, you know, what's really happening here, because these claims have been rejected as obvious, before the algorithm was added is the novelty of the algorithm, and unfortunately I think our hands are just tied that the Supreme Court and this Court have said over and over again that novel algorithms do not take claims outside of the scope of patent, does not make claims eligible. So I hear their argument, and it may be that this algorithm is doing something very special, but the case law that we have in front of us doesn't allow that to make those claims non-eligible. What if hypothetically someone invented a medical device that measures heart rate, but outputs on a display on this medical device the likelihood of some kind of arrhythmia condition? Would that device, you know, and there's a lot of processing power going on inside this device using a series of mathematical operations to convert the data collected on the heart rate to produce some kind of diagnosis about arrhythmia. Would that kind of medical device be patent eligible? I think that would still be in a bit of a gray area, Your Honor. The benefit that your described claim has that these claims don't have is that level of specificity. I mean, for example, in Vonda, you're treating a very specific problem. I mean, the likelihood that someone's going to have a heart attack. You're measuring a specific kind of data in a specific way. You know, someone's heart rate or the oxygen in their blood. The more specificity added to the claims increases the likelihood that they're going to be found eligible, and that's one of the major problems that we have with these claims is their breadth. How do these claims rise or fall in light of the agency's new examination guidelines on Section 101? We think the outcome would have been the same under the new guidelines because, in fact, it happens that while the new guidelines start with three broad categories of abstract ideas, at least two of those categories were discussed in the examiner's office actions and answered in the board's decision, which are mathematics and methods of organizing activities. So we think the framework applied might have been slightly different. We would have started with broader categories, and then we would have moved down from there, but the outcome would have been the same. The methods of organizing activity, what does that mean? Well, to answer Judge Chant's question, the guidelines take abstract ideas and put them into three broad categories, and the methods of organizing activities here would be, you know, collecting information, processing information, what doctors do with that information. It would also probably be, in some ways, a mental process as well. So does Electric Power Group and SAP individually and combined control the outcome of this case? Well, I would say they're certainly persuasive and helpful to the office. We focused on Parker v. Fluke because we felt like that was, you know, the use of mathematical algorithms and trying to make predictions, but we definitely agree that, you know, to the extent that Electric Power and SAP talk about gathering data, processing data, you know, making predictions based on that data, that's certainly analogous to this case and would support the office's decision. If there are no other questions, we rest any other arguments in our brief. Thank you. Thank you. First, I think breadth is not a 101 issue. One can have broad or narrow claims that are abstract or not abstract. But, I mean, in a kind of separate line of cases, we've talked about breadth being a 101 issue, some of them summarized in SAP, right? That the more general you get, the more close to, you know, that that is actually has become one of the ways we have identified something as abstract. Well, I think we would agree that the more abstract something becomes, the more abstract it is. Well, the word abstract has a number of different meanings. Generality happens to be one of them and intangibility another. If I could, I'd like to mention, I'd like to go back to the cases a little bit. You know, we talked a little bit about electric power. Critically, the court said there that there were, one of the ways that the court distinguished the claims there as being not subject matter eligible is the court said that there were no new techniques for analyzing the data, that there were no new algorithms claimed. I think that's important. Are you saying that the electric power group claim recited a mathematical formula that would have passed muster under Section 101? If it had done a new analysis that had gone beyond the abstract idea that had, that was not conventional and well-known, then yes, it would then pass Alice Step 2. When I think about the Bilski case, the independent claim was just about hedging risk. You have two sets of contract transactions at two separate prices. And then there was another claim that recited a formula for calculating what the price would be  The Supreme Court killed both those claims. Are you saying that if that second claim recited a formula that was really novel, extra novel, very innovative, that would have been enough? If it went beyond the abstract idea and was not conventional or well-known, then yes. So innovative math can be a basis for patent eligibility? It can certainly help. We're talking about a method, and we have steps in our method. And if those steps go beyond the abstract idea, we're in Step 2, and those steps are not well-known or conventional or routine, then yes. And I think to get there, you have to look at what the abstract idea is. And here, the abstract idea from the board was predicting patient health risks and diagnoses at a broader level to a mathematical formula or relationship. And I think Claim 1 goes well beyond that and addresses this problem of estimating hidden parameters, which is a stepping stone to be able to objectively diagnose a patient. I think that goes beyond the abstract idea that's been stated, and the steps themselves are not conventional or routine. Thank you, Mr. Davis. That's both counsel and the cases submitted.